UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 10-20717-CR-SEITZ/O'SULLIVAN

UNITED STATES OF AMERICA,

    Plaintiff,

v.

JOHN DOE a/k/a Armando Aguilar,

    Defendant.
_____/

## REPORT AND RECOMMENDATION

THIS MATTER came before the Court on the defendant's Motion to Suppress Statement and Incorporated Memorandum of Law (DE# 15, 11/4/10). On November 5, 2010, this motion was referred to the undersigned by the Honorable Patricia A. Seitz, United States District Court Judge for the Southern District of Florida. See Order of Reference to Magistrate Judge (DE# 16, 11/5/10). Having held an evidentiary hearing on November 23, 2010 and carefully considered the defendant's motion, the court file and the applicable law, the undersigned respectfully recommends that the defendant's Motion to Suppress Statement and Incorporated Memorandum of Law (DE# 15, 11/4/10) be **GRANTED in part and DENIED in part** for the reasons stated herein.

## BACKGROUND

The defendant is charged in a two-count indictment with making a false statement in the application and use of a passport in violation of Title 18, United States Code, Section 1542 and making a false claim of United States citizenship in violation of Title 18, United States Code, Section 911. See Indictment (DE#8, 9/28/10).

On November 4, 2010, the defendant filed the instant motion. See Motion to Suppress Statement and Incorporated Memorandum of Law (DE# 15, 11/4/10). The government filed its response on November 19, 2010. See United States Response to Defendant's Motion to Suppress (DE# 19, 11/19/10). On November 23, 2010, the undersigned held an evidentiary hearing. The government presented the testimony of Customs and Border Protection Officer Roberto Vaquero, Supervisory Customs and Border Protection Officer Henry Urlich and Customs and Border Protection Officer Gustavo Diaz. The defendant testified on his own behalf. The undersigned admitted Government's Exhibits 1 through 7 into evidence. The defendant did not seek to introduce exhibits into evidence.

## FINDINGS OF FACT

All persons arriving at Miami International Airport from foreign countries are subject to inspection by Customs and Border Protection Officers (hereinafter "CBP Officers") to determine whether they are permitted to enter the United States. On September 11, 2010, the defendant arrived at Miami International Airport from Guatemala City, Guatemala.[1] The defendant was traveling under the name of "Jose Luis Zambrana Aponte." The defendant had a United States passport (Government's Exhibit 1), a Customs Declaration form (Government's Exhibit 2), a Puerto Rican birth

---

[1] The parties dispute the time at which the defendant's flight arrived at Miami International Airport. The defendant testified that his flight arrived at 3:55 PM. The government presented testimony from CBP Officer Vaquero and a travel itinerary indicating that the defendant's flight was scheduled to arrive at Miami International Airport at approximately 6:15 PM. See Government's Exhibit 7 (Travel Itinerary). The precise time of the defendant's arrival at Miami International Airport is not pertinent to the undersigned's analysis in this Report and Recommendation.

certificate (Government's Exhibit 3) and several identification cards, including a New Jersey driver's license, a social security card and a college identification card (Government's Exhibit 4) under this name.

The defendant passed through the passport control primary area in Terminal E of the airport without any incident. The defendant proceeded to primary baggage control. While in primary baggage control, the defendant was referred to secondary baggage control. In secondary baggage control, CBP officers questioned the defendant about documents they had found in the defendant's luggage under the name "Armando Aguilar." The defendant was then escorted by two armed CBP officers from secondary baggage control to passport control secondary on the second floor.

When the defendant arrived in passport control secondary, there were approximately 30 to 40 people in this area. The passengers in passport control secondary were permitted to move about the area, use the restroom and obtain water from the water fountain. The defendant was not handcuffed or placed in a cell while in passport control secondary.

CBP officers presented the defendant's documents to CBP Officer Roberto Vaquero and briefed CBP Officer Vaquero on the defendant. CBP Officer Vaquero was armed but did not brandish his weapon at any time.

CBP Officer Vaquero fingerprinted the defendant and ran the defendant's fingerprints through the system to see if the defendant had any prior arrests. While waiting for the results of the fingerprint search, CBP Officer Vaquero began questioning

the defendant.[2] CBP Officer Vaquero began interviewing the defendant around 8:00 PM. It took approximately 10 to 15 minutes to obtain the results of the fingerprint search. The fingerprint search revealed a prior arrest. The name on the prior arrest matched the name on the defendant's passport, "Jose Luis Zambrana Aponte."

CBP Officer Vaquero questioned the defendant about his background. CBP Officer Vaquero asked the defendant where he was from, where he was raised, how old his parents were, where his parents were born and other similar background questions.

---

[2] The defendant was fingerprinted in one room. He was later moved to a second room located near the fingerprint room. It is unclear how many CBP officers were in the fingerprint room with the defendant and how many CBP officers were in the second room with defendant. On cross examination, defense counsel asked CBP Officer Vaquero how many officers were in the fingerprint room besides CBP Officer Vaquero and the person who took the defendant's fingerprints (CBP Officer Vaquero testified that he did not recall if he was the person who actually took the defendant's fingerprints or if another officer took the defendant's fingerprints). Initially, CBP Officer Vaquero testified that there may have been three or four other officers. CBP Officer Vaquero also stated that there were many other people being fingerprinted at the same time and noted that there were possibly three or four computers in the fingerprint room. However, when defense counsel stated that it was not just CBP Officer Vaquero and the defendant in the fingerprint room, CBP Officer Vaquero responded that he did not recall if there were other people in the fingerprint room.

The defendant testified that there were five or six armed officers in a room who were asking him questions. The defendant also testified that he told these individuals that he did not want to answer any questions and that he wanted to talk to a lawyer. The defendant further testified that these individuals told him that he was not allowed to talk to anybody and that he (the defendant) had to make a statement. It was unclear on direct examination whether these events took place in the fingerprint room or the second room where the defendant was taken after being fingerprinted. However, on cross examination, the defendant agreed with the government that he was in the second room (not the fingerprint room) when he was asked questions by numerous officers and stated that he wanted to speak to an attorney. For purposes of this Report and Recommendation, the undersigned finds that there were multiple officers in the fingerprint room and that there were five or six armed officers in the second room. The undersigned credits the defendant's testimony over the testimony of CBP Officer Vaquero with respect to the number of officers present because CBP Officer Vaquero wavered and was uncertain when he testified as to this issue.

The defendant stated that he was from Puerto Rico. CBP Officer Vaquero asked the defendant follow-up questions about Puerto Rico. For instance, CBP Officer Vaquero asked the defendant to name the national anthem of Puerto Rico.[3] The defendant was unable to answer this and other questions about Puerto Rico. The defendant had also stated that he had lived in New York but could not answer CBP Officer Vaquero's questions about New York. CBP Officer Vaquero also asked the defendant about the documents CBP officers had found in the defendant's luggage relating to "Armando Aguilar."

CBP follows a notification policy. It is CBP's policy to allow passengers with a connecting flight to make a telephone call to notify relatives of the delay in case relatives are waiting for the passenger. Here, the defendant had a connecting flight to New York. See Government's Exhibit 7. CBP Officer Vaquero offered the defendant a telephone call.[4] CBP Officer Vaquero did not recall when he made this offer to the

---

[3] CBP Officer Vaquero had previously resided in Puerto Rico.

[4] The defendant disputes that he was permitted to make a telephone call. The Court credits the testimony of CBP Officers Vaquero and Diaz that they each provided the defendant with an opportunity to make a telephone call but the defendant declined because he did not have a telephone number. The government presented testimony that CBP policy is to allow persons with a connecting flight to make a telephone call to relatives. Here, the defendant had a connecting flight to New York. See Government's Exhibit 7. CBP Officers Vaquero and Diaz testified that they followed this policy. During the evidentiary hearing, the defendant's counsel argued that it was unlikely that CBP Officers Vaquero and Diaz would have allowed the defendant to make a telephone call because CBP Officer Vaquero would not allow the defendant to speak to an attorney. However, the Court notes that it is unclear from the testimony when CBP Officer Vaquero told the defendant he could make a telephone call. Thus, CBP Officer Vaquero could have offered to allow the defendant to make the telephone call before the defendant requested an attorney. With respect to CBP Officer Diaz's offer to allow the defendant to make a telephone call, the defendant testified that he did not communicate to CBP Officer Diaz that he wanted to speak to an attorney. Thus, CBP Officer Vaquero's denial of the defendant's request to speak to an attorney does not

defendant but the offer was made while the defendant was in Terminal E. The defendant did not have any telephone numbers so he declined the offer.

At some point during the interview, the defendant stopped answering questions and asked for an attorney. CBP Officer Vaquero called his supervisor, Supervisory CBP Officer Henry Urlich. Supervisory CBP Officer Urlich told the defendant that at this stage in the proceedings CBP was not required to provide the defendant with an attorney.[5]

CBP Officer Vaquero continued interviewing the defendant. The defendant answered some of CBP Officer Vaquero's questions. CBP Officer Vaquero "kept" asking the defendant to state his "true identity."[6] The defendant informed CBP Officer Vaquero that he wanted to make a sworn statement. CBP Officer Vaquero proceeded to write down what the defendant told him. See Government's Exhibits 5-6 (defendant's sworn statement).[7]

CBP Officer Vaquero asked the defendant to state his "full, true and correct name." Id. at 1. The defendant responded that he did not know but that they called him

---

make it less likely that CBP Officer Vaquero and CBP Officer Diaz offered to allow the defendant to make a telephone call.

[5] Supervisory CBP Officer Urlich also testified that he told CBP Officer Vaquero to proceed with taking the defendant's sworn statement. However, CBP Officer Vaquero testified that he did not start taking the defendant's sworn statement until after the defendant was told he would not receive an attorney.

[6] The defendant testified that he was told that he was not leaving the room until he gave a statement and that he had to state his "true identity." The undersigned finds that although CBP Officer Vaquero told the defendant to state his "true identity," he did not tell the defendant that he could not leave the room until he provided a statement.

[7] The defendant's sworn statement totals 12 pages. It was initially taken by CBP Officer Vaquero. See Government's Exhibit 5. After CBP Officer Vaquero finished his shift, CBP Officer Gustavo Diaz asked the defendant additional questions. See Government's Exhibit 6.

Armando. Id. CBP Officer Vaquero asked the defendant if the defendant had any reason to believe he was a United States citizen. Id. The defendant responded "no." Id. CBP Officer Vaquero also asked the defendant if he had ever been arrested before. Id. The defendant responded that he had a prior arrest in New Hampshire. Id. CBP Officer Vaquero showed the defendant a U.S. passport[8] and asked the defendant if this was his passport. Id. at 3. The defendant responded "no." Id. When asked how he obtained the passport, the defendant responded that he completed an application and had received the passport in the mail. Id. CBP Officer Vaquero had been interviewing the defendant for about an hour when the defendant admitted that he was not "Jose Luis Zambrana Aponte," the name on his U.S. passport. The defendant was not handcuffed or otherwise restrained when he made these statements. CBP Officer Vaquero did not read the defendant any Miranda[9] rights.

Shortly before midnight, CBP Officer Vaquero transported the defendant from Terminal E to Terminal J in a patrol car. The defendant was moved to Terminal J because Terminal E closes at midnight. The drive from Terminal E to Terminal J took approximately two minutes. Pursuant to CBP policy, all passengers are restrained during transportation for officer safety. The defendant was handcuffed while he was transported from Terminal E to Terminal J. CBP Officer Vaquero told the defendant that he was being handcuffed for officer safety and that he would remove the handcuffs when they arrived at their destination. The defendant was handcuffed for approximately

---

[8] This was the passport that the defendant presented upon arrival in the United States. The name on the passport was "Jose Luis Zambrana Aponte." See Government's Exhibit 1.

[9] Miranda v. Arizona, 384 U.S. 436 (1966).

7

two to five minutes. CBP Officer Vaquero removed the defendant's handcuffs when they arrived in Terminal J. CBP Officer Vaquero placed the defendant in a seat in the waiting area of Terminal J. The waiting area in Terminal J was similar to the waiting area in Terminal E. Passengers were allowed to walk around in this area and use the restroom. The defendant was not handcuffed in Terminal J.[10]

At Terminal J, CBP Officer Vaquero briefed his supervisor and finished taking the defendant's sworn statement. CBP Officer Vaquero asked the defendant about six or seven more questions. CBP Officer Vaquero then printed the sworn statement and gave it to the defendant to read. The defendant read and signed the sworn statement.

At approximately 2:00 AM on September 12, 2010, CBP Officer Gustavo Diaz initiated contact with the defendant. CBP Officer Diaz offered the defendant food. At

---

[10] The parties dispute whether the defendant was handcuffed in Terminal J. Specifically, the defendant testified that he was handcuffed to a chair in the waiting area from the time CBP Officer Vaquero resumed the sworn statement "to when" he gave his sworn statement to CBP Officer Diaz. It is unclear from the defendant's testimony whether he maintains he was handcuffed throughout CBP Diaz's questioning or whether he was uncuffed immediately preceding the questioning by CBP Officer Diaz. On cross-examination, CBP Officer Vaquero was asked whether he handcuffed the defendant to a chair in the waiting area of Terminal J. CBP Officer Vaquero testified that he did not recall. Thus, CBP Officer Vaquero's testimony does not directly contradict the defendant's testimony. On the other hand, CBP Officer Diaz testified that the defendant was not handcuffed and that he had observed the defendant going towards the restrooms "a couple of times." The defendant testified that CBP officers did not take his handcuffs off so he could use the restroom. Thus, the defendant's testimony is in conflict with the testimony of CBP Officer Diaz. Having observed the demeanor of the witnesses and considered their testimony as a whole, the undersigned credits CBP Officer Diaz's testimony that the defendant was not handcuffed in Terminal J over the testimony of the defendant. See United States v. Boulette, 265 Fed. Appx. 895, 898 (11th Cir. 2008) (citing United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002) (noting that "[c]redibility determinations are within the province of the fact finder 'because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses.'").

some point, the defendant was given the opportunity to make a phone call.[11] The defendant did not have any telephone numbers. At approximately 6:30 AM, CBP Officer Diaz resumed the defendant's sworn statement in an "addendum declaration." See Government's Exhibit 6. CBP Officer Diaz reviewed the defendant's sworn statement taken by CBP Officer Vaquero prior to obtaining the addendum declaration. CBP Officer Diaz did not read the defendant any Miranda rights. The defendant did not tell CBP Officer Diaz that he wanted to speak to an attorney. CBP Officer Diaz asked the defendant some incriminating questions including: how much the defendant paid for the birth certificate and social security card and whether the defendant knew that it was illegal to fraudulently obtain U.S. documents. CBP Officer Diaz printed the defendant's sworn statement and had the defendant sign the statement at the bottom of each page.

This was the defendant's final interview with Customs and Border Protection. CBP Officer Diaz gave the defendant's sworn statement to his supervisor prior to completing his shift. The defendant's reports were turned over to the Department of State Diplomatic Security Service. The defendant was asked by the department if he wanted to answer questions. The defendant invoked his Miranda rights and no further questioning took place.

---

[11] The defendant disputes that he was allowed to make a telephone call. The undersigned credits the testimony of CBP Officers Vaquero and Diaz that it was CBP policy to offer a passenger with a connecting flight a telephone call and that this offer was made to the defendant. See Footnote 4, supra.

**ANALYSIS**

The defendant seeks to suppress statements he made to CBP Officers Vaquero and Diaz at Miami International Airport after he requested an attorney.[12] It is undisputed that the defendant was not given Miranda warnings prior to being questioned by these officers. The defendant argues that his interrogation by these officers without Miranda warnings violated his Sixth Amendment right to counsel, his Fifth Amendment privilege against self-incrimination and the Due Process Clause of the Fifth Amendment to the United States Constitution.

Under Miranda, a suspect taken into custody and subject to interrogation must be advised of certain rights including the right to remain silent and the right to counsel. See United States v. Brown, 441 F. 3d 1330, 1347 (11th Cir. 2006). The Eleventh Circuit has held that aliens at the border are entitled to Miranda warnings before custodial interrogations. United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996) (citations omitted). Whether a suspect is in custody and thus entitled to Miranda warnings turns on whether restrictions on the suspect's freedom of movement are of the degree associated with a formal arrest. Id. (citing Minnesota v. Murphy, 465 U.S. 420, 430 (1984)). "[S]ome degree of questioning and delay is necessary and is to be expected at entry points into the United States," because of the strong governmental interest in controlling the borders. Id. at 1120. Thus, "questioning at the border must rise to a distinctly accusatory level before it can be said that a reasonable person would feel restraints on his ability to roam to the 'degree associated with formal arrest.'" Id.

---

[12] At the evidentiary hearing on November 23, 2010, the defendant stated that he was not moving to suppress the statements he made prior to his request for an attorney.

(citing Murphy, 465 U.S. at 430).

The Court must look at the totality of the circumstances to determine if a reasonable innocent man in the defendant's position would feel that he was not free to leave. Moya, 74 F.3d at 1119. The test is objective. The actual subjective beliefs of the interviewing officer and the defendant on whether the defendant was free to leave are irrelevant. Id.

In Moya, the Eleventh Circuit affirmed a conviction based on statements made by the defendant during an interview with an immigration inspector at the airport. Moya, 74 F. 3d at 1118. The statements were made without the benefit of Miranda warnings. Id. The Eleventh Circuit held that the defendant was not in custody when he made the statements and was therefore not entitled to Miranda warnings. Id. at 1119. The Eleventh Circuit noted that the defendant in Moya was not moved or restrained by officers on his way to the interview, the defendant was not handcuffed, no guns were drawn, the defendant "was not booked or told of formal accusations, nor told that he was under arrest," the defendant did not ask to leave and the immigration inspector did not tell the defendant that he was not free to leave. Id. Additionally, the defendant "made no admission during the interview that would have led a reasonable person in his place to conclude that he would be arrested immediately." Id.

In the instant case, the defendant argues that the oral and written statements he made to CBP Officer Vaquero after the defendant requested an attorney must be suppressed because the defendant was in custody at the time he made those statements. The defendant points to the following factors as evidence that he was in custody: the defendant was escorted by two armed CBP officers from secondary

11

baggage control to passport control secondary, the defendant was placed in a room with five or six armed CBP officers, defendant requested a lawyer and that request was denied and the CBP officers told the defendant he needed to disclose his true identity.[13] Of note, the defendant had not been placed in handcuffs at that time.[14]

      The undersigned finds that the defendant was not in custody at the time he requested an attorney. At that time, the defendant had been escorted to passport control secondary by two armed CBP officers, had been fingerprinted and had been asked routine background questions by CBP Officer Vaquero to determine whether the defendant should be permitted to enter into the United States. None of the CBP officers brandished their weapons or threatened the defendant in any manner. CBP Officer Vaquero questioned the defendant about his mother and father, Puerto Rico and New York City. CBP Officer Vaquero also asked the defendant about the documents he had found in the defendant's luggage under the name "Armando Aguilar." The undersigned finds that these questions are not so accusatory so as to lead a reasonable innocent person in the defendant's position to feel a restraint on his freedom. "[Q]uestioning at the border must rise to a distinctly accusatory level before it can be said that a reasonable person would feel restraints on his ability to roam to the 'degree associated

---

[13] The defendant also states that he was told that he was not leaving the room until he gave a statement. The undersigned finds that although CBP Officer Vaquero told the defendant to state his "true identity," he did not tell the defendant that he could not leave the room until he provided a statement.

[14] The defendant requested an attorney before he admitted to CBP Officer Vaquero that he was not "Jose Luis Zambrana Aponte," the name on the defendant's passport. The defendant made this admission at approximately 9:00 PM. The defendant was not handcuffed and moved from Terminal E to Terminal J until shortly before midnight.

12

with formal arrest.'" Moya, 74 F. 3d at 1120 (citing Murphy, 465 U.S. at 430). Additionally, the defendant did not ask to leave and CBP Officer Vaquero did not tell the defendant that he was not free to leave.

The undersigned does find that the defendant was in custody after he admitted in his sworn statement to CBP Officer Vaquero that he had previously been arrested in New Hampshire. See Government's Exhibit 5 at 2. Prior to making this admission, the defendant had admitted that he did not have reason to believe that he was a United States citizen -- thus, effectively admitting that he used a false U.S. passport to enter the United States. Additionally, the defendant had been escorted by two armed CBP officers to the second floor of Terminal E, had been fingerprinted (a procedure that is often associated with booking), was being questioned with five or six armed CBP officers in the room, was denied a request for an attorney and was told to disclose his "true identity." The undersigned finds that the aforementioned factors coupled with the defendant's admission that he did not have reason to believe he was a United States citizen and CBP Officer Vaquero's question "[h]ave you ever been arrested before,"[15] would have led a reasonable person in the defendant's place to conclude that he was under arrest. Moya, 74 F. 3d at 1119. Because CBP Officer Vaquero did not read the defendant his Miranda rights, all statements made by the defendant to CBP Officer Vaquero following the admission that the defendant was previously arrested in New Hampshire must be suppressed.

The defendant also seeks to suppress the sworn statement he gave to CBP

---

[15] CBP Officer Vaquero's use of the word "before" would indicate to a reasonable person that he was presently under arrest and was being interrogated about any arrests prior to the present arrest.

Officer Diaz (Government's Exhibit 6). This sworn statement (Government's Exhibit 6) must be suppressed because the defendant was in custody at the time he made this statement, for the same reasons he was in custody when he gave his sworn statement to CBP Officer Vaquero, see supra. In addition to the factors outlined above, by the time the defendant gave his sworn statement to CBP Officer Diaz, the defendant had been physically moved from Terminal E to Terminal J in handcuffs and had been detained for at least 10 hours.[16] Under the totality of the circumstances, a reasonable innocent person would have concluded that he was not free to leave at the time CBP Officer Diaz took the defendant's sworn statement. Because the defendant was in custody at the time he gave his sworn statement to CBP Officer Diaz, the defendant was entitled to Miranda warnings. Therefore, the sworn statement the defendant gave to CBP Officer Diaz (Government's Exhibit 6) without the benefit of Miranda must be suppressed.

**2.   Voluntariness**

The defendant also argues that the statements he made to CBP Officers Vaquero and Diaz should be suppressed because the statements were involuntarily made and were the "result of the defendant being threatened and being held incommunicado for approximately eight hours, his being denied access to an attorney . . . and being questioned in derogation of his right to remain silent." See Motion to Suppress Statement and Incorporated Memorandum of Law (DE# 15 at 3-4, 11/4/10). The undersigned is not persuaded by this argument. There is no indication that CBP

---

[16] At least 10 hours had transpired from the time CBP Officer Vaquero began interviewing the defendant at 8:00 PM until 6:30 AM the following morning when CBP Officer Diaz began taking the defendant's sworn statement (Government's Exhibit 6).

Officers Vaquero and Diaz questioned the defendant in a hostile manner or brandished their weapons. The conduct of these officers did not rise to the level of coerciveness such that the defendant's statements were not voluntary under the Due Process Clause.

## **RECOMMENDATION**

For the foregoing reasons, the undersigned respectfully recommends that the defendant's Motion to Suppress Statement and Incorporated Memorandum of Law (DE# 15, 11/4/10) be **GRANTED in part and DENIED in part**.

Pursuant to 28 U.S.C. §636(b)(1)(B) and (C), the parties may serve and file written objections to this Report and Recommendation with the Honorable Patricia A. Seitz, United States District Judge, within fourteen (14) days of receipt of a copy of this Report and Recommendation. See Nettles v. Wainwright, 677 F.2d 404 (5th Cir. 1982). **A party filing an objection to this Report and Recommendation shall order a transcript of the suppression hearing and provide a copy to the district court.**

RESPECTFULLY SUBMITTED, in Chambers, at Miami, Florida this **6th** day of December, 2010.

_____
JOHN J. O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE

Copies provided to:
U.S. District Judge Seitz
All Counsel of Record